125 Cal.App.3d 904 (1981)
178 Cal. Rptr. 673
INTERSTATE FIRE AND CASUALTY INSURANCE COMPANY, Plaintiff and Appellant,
v.
CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, Defendant and Respondent.
Docket No. 60160.
Court of Appeals of California, Second District, Division Four.
November 23, 1981.
*907 COUNSEL
Hillsinger & Costanzo, Loyal C. Pulley, Brian F. Zimmerman and Gary L. Green for Plaintiff and Appellant.
Clausen, Harris & Campbell, Lon Harris and Marie D. Clause for Defendant and Respondent.
OPINION
FILES, P.J.
This appeal is from a judgment entered March 14, 1980, after the demurrer of defendant California Insurance Guarantee Association (hereafter CIGA) to the amended complaint of Interstate Fire and Casualty Insurance Company (hereafter Interstate) was sustained without leave to amend.
The amended complaint is in four counts, each based upon the same alleged facts embellished with various legal theories. Although the complaint is denominated "for declaratory relief," it is in substance an action on a matured claim for money allegedly due.
Allstar Insurance Corporation (hereafter Allstar) issued to Holiday Hill Ski Lift (hereafter Holiday) primary liability insurance with limits of $100,000 per claimant. Plaintiff Interstate provided excess insurance for losses over $100,000, with a limit of $1 million. A person named Schuller, who was injured on Holiday's premises, sued Holiday for $250,000 in damages. Around March 7, 1977, when the case was at issue, Allstar became insolvent, and CIGA took over the defense *908 pursuant to Insurance Code section 1063.2. It is alleged that both Allstar, prior to its insolvency, and CIGA, afterwards, had opportunities to settle the injury claim within the limits of the Allstar policy, but they unreasonably failed to do so. The case went to trial, and judgment was against Holiday for $217,250, of which CIGA paid $100,000 and Interstate paid the excess.
Interstate prays judgment against CIGA for what it paid on the judgment, plus interest and expenses. Plaintiff seeks to hold CIGA liable both for the alleged wrong of the insolvent Allstar in failing to make a prompt and reasonable settlement, and for CIGA's own failure to settle the injury claim prior to judgment.
CIGA is an involuntary, unincorporated association of insurers admitted to transact business in California. Each liability insurer, as a condition of its authority to transact insurance in this state, is required to participate in the association. (Ins. Code, § 1063.) (All citations to statutes hereafter are to the : Insurance Code.) The statutory duty of CIGA is to provide for each member insolvency insurance to pay some (but not all) claims arising out of an insurance policy of an insolvent insurer. (§§ 119.5, 1063 et seq.)
Subdivision (c)(1) of section 1063.1[1] contains a general definition of "covered claims," which is qualified by other provisions of section 1063.1 and 1063.2. Subdivision (c)(4) of section 1063.1 provides: "`Covered claims' shall not include any obligations to insurers, insurance pools, or underwriting associations, except as otherwise provided in this chapter."
Subdivision (c)(5) provides that "covered claims," shall not include "that portion of any claim which is in excess of any applicable limits provided in the insurance policy issued by the insolvent insurer."
*909 Subdivision (c)(7) reads as follows: "`Covered claims' shall not include (a) any claim to the extent it is covered by any other insurance of a class covered by the provisions of this article available to the claimant nor (b) any claim by any person other than the original claimant under the insurance policy in his own name, his executor, administrator, guardian or other personal representative or trustee in bankruptcy and shall not include any claim asserted by an assignee or one claiming by right of subrogation, except as otherwise provided in this chapter."
Section 1063.2, subdivision (g) provides: "`Covered claims' shall not include any judgments against or obligations or liabilities of the insolvent insurer or the commissioner, as liquidator, or otherwise resulting from alleged or proven torts, nor shall any default judgment against the insolvent insurer, or against the insured of the insolvent insurer, be binding against the association."
The statutory intent not to use CIGA funds to pay the insolvent's obligations to other insurers, as expressed in section 1063.1, is spelled out further in section 1063.2, subdivisions (c)(1), relating to uninsured motorists coverage, and (c)(2), relating to collision coverage.
This intent was discussed and applied in California Union Ins. Co. v. Central National Ins. Co. (1981) 117 Cal. App.3d 729 [173 Cal. Rptr. 35], a case involving three companies, each of whom apparently had written liability coverage for the same risk. That case arose out of a claim against the insured, which was defended by one of the companies, Central, and resulted in a judgment, which Central paid. Central then sought contribution or indemnification from the other two. While this litigation was pending among the three insurers, one of them, Signal, became insolvent, and CIGA was substituted in Signal's place in the litigation. Central's cross-complaint alleged that if it had not paid the judgment, the insured would have had a claim against CIGA. Central also alleged that Signal had violated an agreement to pay seven-eighths of the judgment against the insured.
CIGA's demurrers to the complaint and cross-complaint in that case were sustained, and the ensuing judgment in favor of CIGA was affirmed on appeal. After discussing the pertinent portions of section 1063.1, the appellate court concluded: "The Legislature chose to provide a limited form of protection for the public, not a fund for the protection of other insurance companies from the insolvencies of fellow *910 members.... [¶] The Legislature's choice to provide coverage only to the original claimant under the policy is rational and constitutional." (117 Cal. App.3d at p. 734.)
We next turn to an analysis of the theories upon which plaintiff here seeks to recover.
(1) In part, the action is to recover for the alleged wrong of Allstar, which allegedly violated the duty of good faith and fair dealing owed to its policyholder, in that Allstar failed to make a prompt and reasonable settlement within the policy limits. The statute clearly establishes that CIGA funds may not be used to compensate for the wrongful acts of the insolvent insurer. (See § 1063.2, subd. (g), quoted above.) The alleged wrong of Allstar therefore cannot be the basis of a cause of action against CIGA.
(2) Plaintiff also seeks recovery against CIGA for its alleged wrong in failing to make a reasonable settlement within the policy limits. This raises the question whether CIGA owed any such duty to plaintiff as an excess carrier.
Although an insurer's breach of duty to use good faith and fair dealing in seeking to settle a claim sounds in tort, the duty has been said to arise out of the insurance contract. (Gruenberg v. Aetna Ins. Co. (1973) 9 Cal.3d 566, 575 [108 Cal. Rptr. 480, 510 P.2d 1032].) Under some circumstances, the performance of that duty may be enforced by a party who is subrogated to the rights of the insured.
In Commercial Union Assurance Companies v. Safeway Stores, Inc. (1980) 26 Cal.3d 912 [164 Cal. Rptr. 709, 610 P.2d 1038], the controlling question was whether a self-insurer (Safeway Stores) owed any duty to settle within its self-insured limit, for the protection of the carrier who covered the excess. The complaint of the excess carrier contained separate causes of action, one for negligence and another for breach of the duty of good faith and fair dealing. In affirming a judgment for Safeway based on a demurrer to the complaint, the Supreme Court explained the nature of the duty of a primary carrier towards an excess carrier (at p. 917): "It has been held in California and other jurisdictions that the excess carrier may maintain an action against the primary carrier for [] [wrongful] refusal to settle within the latter's policy limits [citations]. This rule, however, is based on the theory of *911 equitable subrogation: Since the insured would have been able to recover from the primary carrier for a judgment in excess of policy limits caused by the carrier's wrongful refusal to settle, the excess carrier, who discharged the insured's liability as a result of this tort, stands in the shoes of the insured and should be permitted to assert all claims against the primary carrier which the insured himself could have asserted [citations]. Hence, the rule does not rest upon the finding of any separate duty owed to an excess insurance carrier."
Insofar as plaintiff's claim here is based on equitable subrogation, section 1063.1, subdivision (c)(7), quoted above, forbids CIGA to pay it.
(3) An alternative theory offered by plaintiff is that CIGA is liable in tort for having violated the Unfair Practices Act, Insurance Code section 790 et seq.[2]
In Royal Globe Ins. Co. v. Superior Court (1979) 23 Cal.3d 880 [153 Cal. Rptr. 842, 592 P.2d 329], the Supreme Court held that a person injured by the alleged negligence of an insured might sue the negligent party's insurer for unfair settlement practices in violation of *912 that statute. The court said that the statute "was intended to prohibit unfair settlement practices by insurers directed against both claimants and insureds." (23 Cal.3d at p. 888.)
The situation here is very different from that in Royal Globe. Here we have a plaintiff who is neither the injured party nor the insured.
Plaintiff's theory here may be summarized thus: Section 790.02 says "no person" shall engage in any unfair trade practice; it is an unfair trade practice not to attempt in good faith to effect prompt, fair and equitable settlements (§ 790.03 subd. (h) (5)); and therefore this statute imposed a duty upon CIGA, which CIGA failed to perform, thereby injuring plaintiff.
Plaintiff's tort theory conflicts with language in section 1063.12, subdivision (a), which is a part of the statute creating CIGA. That section reads as follows: "The association, its member insurers, and its officers, directors, agents or employees of the association, or its member insurers, shall under no circumstances be liable for any sum in excess of the amount of covered claims of the insolvent insurer, as defined under subdivision (c) of Section 1063.1 of this article and the costs of administration and the costs of loss adjustment, investigation and defenses relating to claims thereunder."
We must consider whether the broad language of the Unfair Practices Act, designed to govern "trade practices in the business of insurance" (§ 790), imposes such a duty upon a unique and specialized association whose liability is expressly limited by its organic law.
Several circumstances militate against an interpretation of the Unfair Practices Act which would override the statutory limitations on CIGA's duties.
First, as we have pointed out above, the statute which governs CIGA provides a limited form of protection for the public, and not for the protection of insurers.
Second, the grant of immunity in section 1063.12, quoted above, is applicable to no one other than CIGA and its personnel. Ordinarily such a specific and limited provision is deemed to control over any general statement, if there is a conflict. (Code Civ. Proc. § 1859; see Bailey *913 v. Superior Court (1977) 19 Cal.3d 970, 976, fn. 8 [140 Cal. Rptr. 669, 568 P.2d 394].)
Third, the relationship between the Insurance Commissioner and CIGA is a factor to be considered in evaluating the duties and liabilities of the latter.
The complaint in this action names the Insurance Commissioner as a defendant, although no judgment for damages is asked against him, and he is not named in the judgment of dismissal which is the subject of this appeal. The complaint alleges that the Insurance Commissioner "issued orders, instructions or regulations to defendant CIGA on or after March 17, 1977, as to the method, procedure and practices of paying insolvent insurers such as Allstar's `covered claims,' including the Schuller lawsuit."
The Insurance Commissioner is a state officer appointed by the Governor with the consent of the Senate (§ 12900). The code requires that he enforce the execution of the laws regulating the business of insurance. (§ 12921.) The Unfair Practices Act declares in section 790.04: "The commissioner shall have power to examine and investigate into the affairs of every person engaged in the business of insurance in the State in order to determine whether such person has been or is engaged in any unfair method of competition or in any unfair or deceptive act or practice prohibited by Section 790.03 or determined pursuant to this article to be an unfair method of competition or an unfair or deceptive practice in the business of insurance...."
Section 790.05 directs the commissioner to issue a cease and desist order to any person engaged in the business of insurance who is found to have engaged in any of the acts defined in section 790.03.
The Insurance Commissioner is also directed by subdivision (b) of section 1063 to appoint the nine members of the Board of Governors who manage the California Insurance Guarantee Association. The operation of the association is at all times subject to the regulation of the commissioner. (§ 1063.9.) For this purpose the commissioner has access to all of the records and other papers of the association and may examine the personnel of the association under oath.
Subdivision (b) of section 1063.9 provides: "Any member insurer aggrieved by any action or decision of the association [CIGA] may appeal *914 to the commissioner within 30 days after the action or decision of the association and after exhaustion of administrative remedies may seek court relief as provided in Section 12940."
From the foregoing, as well as from the allegations of the complaint in this action, it appears that the Insurance Commissioner is required by law both to enforce the Unfair Practices Act and to regulate and oversee CIGA. This statutory relationship is such that the court is entitled to view the practices of CIGA as reflecting the Insurance Commissioner's interpretation of the applicable statutes. "The construction of a statute by the officials charged with its administration must be given great weight, for their `substantially contemporaneous expressions of opinion are highly relevant and material evidence of the probable general understanding of the times and of the opinions of men who probably were active in the drafting of the statute.'" (Whitcomb Hotel, Inc. v. Cal. Emp. Com. (1944) 24 Cal.2d 753, 756-757 [151 P.2d 233, 155 A.L.R. 405].)
Under all the circumstances, we must conclude that the Legislature did not intend CIGA to be civilly liable to an excess insurer under the Unfair Practices Act.[3]
Plaintiff also contends that the distinction between CIGA's liability and the liability of insurers generally violates the equal protection clauses of the state and federal Constitutions. The constitutionality of the CIGA statute was considered and summarily upheld in California Union Ins. Co. v. Central National Ins. Co., supra, 117 Cal. App.3d 729, 734. We need only add that CIGA's situation is not similar to that of insurers generally.
The judgment is affirmed.
Kingsley, J., concurred.
WOODS, J., Concurring and Dissenting.
I agree with the majority that the appellant must fail in its action to recover for the alleged wrong of Allstar for the claimed failure of Allstar to make a prompt and reasonable settlement within the policy limits. The statute clearly *915 establishes that CIGA funds may not be used to compensate for the wrongful acts of the insolvent insurer. (Ins. Code, § 1063.2, subd. (g).)
I concur also in the reasoning and conclusion reached by the majority in barring appellant's claim insofar as it is based on equitable subrogation, in that section 1063.1, subdivision (c)(7) forbids CIGA to pay such claims.
I disagree, however, with the analysis of, and conclusion that, CIGA is immune from tort liability for violation of the Unfair Practices Act, Insurance Code section 790 et seq.
The purpose of the act as set forth in section 790 "is to regulate trade practices in the business of insurance ... by defining, or providing for the determination of, all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined." It is contended that CIGA is not engaged in the business of insurance and therefore cannot be held liable under the act, even though CIGA's members are specifically prohibited from engaging in unlawful trade practices by Insurance Code section 1063.13. This position is untenable. It is irrelevant that CIGA does not sell insurance policies, it is engaged in one of the very portions of the insurance business that the Unfair Practices Act is intended to cover; it is engaged in the business of claims handling.
Section 790.03 defines unfair methods of competition and unfair and deceptive acts or practices in the business of insurance as: "(h) Knowingly committing or performing with such frequency as to indicate a general business practice any of the following unfair claims settlement practices:
".... .... .... ...
"(2) Failure to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.
".... .... .... ...
"(5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.
*916 ".... .... .... ...
"(12) Failing to settle claims promptly, where liability has become apparent, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.
"(13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement."
If, as alleged, CIGA has blatantly refused to participate in settlement discussions, it has violated this section.
The majority opinion contends that plaintiff's tort theory conflicts with language in section 1063.12, subdivision (a), which provides that under no circumstances shall CIGA be liable for sums in excess of the amount of covered claims of the insolvent insurer.
Clearly, section 1063.12 means that under no circumstances can CIGA be liable for any sum in excess of the face amount of the policy on a covered claim. It was the obvious intent of the Legislature to insure that CIGA not be made to pay an excess claim against an insolvent carrier, nor be made vicariously liable for the bad faith torts of an insolvent carrier. There is no reason to believe that this language was intended, nor should it be interpreted, to mean that CIGA was granted immunity from tort liability by the Legislature. Section 1063.12 has no application to any judgment against CIGA based on its own tortious conduct.
The majority also makes much of the responsibilities of the Insurance Commissioner, as the enforcer of the Unfair Practices Act, to act as a bulwark against capricious action by CIGA in the processing of claims. It is their decision that appellant has failed to show a need for holding CIGA civilly liable, apparently concluding that the power of the commissioner to, after notice and hearing, issue a cease and desist order (§ 790.05) and impose a penalty of $50, or for a wilful violation $500, is an adequate remedy. I disagree.
With respect to the provision in subdivision (b) of section 1063.9, that a member "may appeal" to the commissioner, it is important to *917 note the permissive nature of the term. There is nothing in this language which compels a member to submit to this review. Further, it is argued by Interstate that it is not a "member insurer" it is "surplus line insurer" engaged in interstate commerce, which is covered by Insurance Code sections 1760 and 1761 et seq.
In any event, the authority of the commissioner to issue cease and desist orders to its members is not the only remedy available to Interstate and is not determinative of the issue before us. The Supreme Court held, in Royal Globe Ins. Co. v. Superior Court (1979) 23 Cal.3d 880 [153 Cal. Rptr. 842, 592 P.2d 329], that the commissioner does not have the sole authority to regulate trade practices with regard to unfair or deceptive acts. Section 790.09 of the act provides that a cease and desist order issued by the commissioner under the provisions of the act shall not absolve an insurer from "civil liability or criminal penalty under the laws of this state arising out of the methods, acts or practices found unfair or deceptive."
The judgment should be affirmed in part, but reversed as to the first cause of action, the respondent should be allowed to proceed against the appellant for violation of the Unfair Practices Act. (Ins. Code, § 790 et seq.)
A petition for a rehearing was denied December 10, 1981. Woods, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied January 20, 1982.
NOTES
[1] Section 1063.1 (c)(1): "`Covered claims' means the obligations of an insolvent insurer, (i) imposed by law and arising out of an insurance policy of the insolvent insurer; (ii) which were unpaid by the insolvent insurer; (iii) which are presented as a claim to the liquidator in this state or to the association on or before the last date fixed for the filing of claims in the domiciliary liquidating proceedings; (iv) which were incurred prior to, on, or within 30 days after the date the liquidator was appointed; (v) for which the assets of the insolvent insurer are insufficient to discharge in full; (vi) in the case of a policy of workers' compensation insurance, to provide workers' compensation benefits under the Workers' Compensation Law of this state and (vii) in the case of other classes of insurance if such policy is issued to a resident of this state or claim against an insured thereunder is made by a resident of this state."
[2] Section 790: "The purpose of this article is to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the Act of Congress of March 9, 1945 (Public Law 15, Seventy-ninth Congress), by defining, or providing for the determination of, all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined."

Section 790.01: "This article applies to reciprocal and interinsurance exchanges, Lloyds insurers, fraternal benefit societies, fraternal fire insurers, grants and annuities societies, insurers holding certificates of exemptions, motor clubs, nonprofit hospital associations, agents, brokers, solicitors, surplus line brokers and special lines surplus line brokers as well as all other persons engaged in the business of insurance."
Section 790.02: "No person shall engage in this State in any trade practice which is defined in this article as, or determined pursuant to this article to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance."
Section 790.03: "The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance.... (h) Knowingly committing or performing with such frequency as to indicate a general business practice any of the following unfair claims settlement practices:... (2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.... (5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.... (12) Failing to settle claims promptly, where liability has become apparent, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage. (13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement...."
[3] Contrary to the suggestion in the dissenting opinion, we do not base our decision on any assumption that the plaintiff has an administrative "remedy" for the loss of which it complains in this action. We simply look to the commissioner as an authority in the interpretation of the statutes which he administers.