[L.A. No. 32116. Mar. 7, 1988.]

ALVIN S. ISAACSON et al., Plaintiffs and Appellants, v.
CALIFORNIA INSURANCE GUARANTEE ASSOCIATION,
Defendant and Respondent.

778

COUNSEL

Rosenfeld, Meyer & Susman, Walter S. Weiss, Thomas Larry Watts and James Y. Leong for Plaintiffs and Appellants.

Gantz & Forer, Emmett J. Gantz and Steven B. Stevens as Amici Curiae on behalf of Plaintiffs and Appellants.

Clausen, Harris & Campbell, Kenneth H. Clausen, Marie D. Clause, Lon Harris, Stanley T. Gilliam, Frederick G. Hall, Overton, Lyman & Prince, Hawkins, Schnabel & Lindahl and Kelley K. Beck for Defendant and Respondent.

Parkinson, Wolf, Lazar & Leo, Richard B. Wolf, Michael W. Connally and Robert J. Kent as Amici Curiae on behalf of Defendant and Respondent.

OPINION

LUCAS, C. J.—In this case two insureds of an insolvent insurance company seek damages from the California Insurance Guarantee Association

(CIGA) following settlement of a claim by a third party against the insureds. In 1974, Andrew Ouellette sued Doctors Alvin S. Isaacson and Sidney S. Grant (plaintiffs herein) alleging malpractice in the course of surgery performed on his lower back. Imperial Insurance Company (Imperial), from which plaintiffs and their professional corporation had obtained a liability insurance policy with limits of $1 million, accepted plaintiffs' defense and retained an outside law firm to represent them. In January 1978, Imperial was adjudged insolvent and CIGA assumed the doctors' defense pursuant to Insurance Code section 1063.2. (All further statutory references are to this code unless otherwise indicated.) The malpractice case settled for $500,000. CIGA paid $400,000 (the maximum amount it offered to settle) and plaintiffs, fearing liability beyond CIGA's $500,000 limit if the case proceeded to trial, paid the additional $100,000. Plaintiffs now seek to recover from CIGA reimbursement for the $100,000 they paid to settle, and additional damages based on several tort theories.

We address several primary issues: (1) whether CIGA can be held liable for tort damages for violations of the Unfair Practices Act (§ 790 et seq.), for intentional infliction of emotional distress, or for common law breach of the implied covenant of good faith and fair dealing; (2) if CIGA is not subject to liability for tort damages under these three theories, whether it may nonetheless be subject to liability for reimbursement in the event it fails to fulfill its statutory duties under sections 1063 to 1063.14[1] (hereafter referred to as the Guarantee Act); and (3) whether voluntary contribution by an insured in settlement, to supplement CIGA's payment in settlement of less than its statutory maximum, constitutes presumptive proof of the insured's liability for the full amount of the settlement, absent a failure to provide coverage or a refusal to defend by CIGA. We hold that CIGA is immune from liability under the Unfair Practices Act and under the theories of intentional infliction of emotional distress and common law bad faith.[2] In so holding, we observe that CIGA nonetheless may be subject to liability for reimbursement to insureds if it breaches its statutory duty under the Guarantee Act to pay and discharge "covered claims," although plaintiffs failed to establish such liability here. We also hold that the insureds'

---

[1] The Legislature recently amended sections 1063.1 and 1063.2. (Stats. 1987, ch. 833.) These amendments apply only to claims resulting from insured events occurring on or after January 1, 1988. (Stats. 1987, ch. 833, § 3.) Because the amendments are inapplicable here, we do not discuss them, other than to note that they further restrict the definition of what constitutes a "covered claim" payable by CIGA. Our citations in this opinion are to the prior statutory language.

[2] Contrary to the dissent's assertion that our opinion insulates CIGA "from all tort liability" (*post*, at p. 796), our discussion addresses CIGA's tort liability only in relation to the claims adjustment process. Nothing in the opinion affects the ordinary tort liability of CIGA and its employees outside this context. (Cf. § 1063.12, subd. (b).)

$100,000 settlement contribution does not create a presumption that they are liable, in the amount they paid, on the underlying claim.[3]

## I. Facts

### A. The Underlying Claim of Negligence

Before April 1973, Ouellette complained of a nagging backache and pain in his left leg. Dr. Isaacson diagnosed Ouellette's symptoms as resulting from deterioration of vertebrae in his lower back. Isaacson informed Ouellette that in his judgment, without surgery, Ouellette would be paralyzed by age 40. Isaacson recommended surgery and Ouellette, then age 27, agreed.

Plaintiffs performed the operation in April 1973. The surgery was not a success—it aggravated Ouellette's condition, and apparently caused new complications. Dr. Isaacson and another doctor performed corrective surgery in June 1973, but this failed to relieve all of Ouellette's disability.

As part of Imperial's investigation of Ouellette's claim, Dr. Thomas Redden, an orthopedist, examined Ouellette and concluded that he was severely crippled. Redden, however, also indicated that nothing in the medical records suggested the surgery itself was performed negligently. Further, he stated, "Dr. Isaacson was within the standard of practice in recommending surgery if he was convinced that the symptomatology he received from [Ouellette] at that time was significant." The doctors' counsel reported to CIGA that they could "put on a strong case that the events of the first and second surgery were well within the standards of practice of orthopedic surgeons." Ouellette's own expert on damages, Dr. Sidney Walker, criticized the surgery as premature, but in his report expressed no opinion as to whether the surgery was performed negligently. In sum, it was not clear whether plaintiffs were negligent.

Assuming Ouellette could prove the doctors were negligent, the amount of potential damages remained uncertain. First, Ouellette's work record was sporadic even before the April 1973 operation. Second, despite estimates by doctors for both parties that Ouellette had a 50 percent chance of returning to work if he underwent further corrective surgery, Ouellette refused to submit to another operation. His refusal was contrary to the advice of all

---

[3] Because of these conclusions, we find it unnecessary to reach the issues, raised by the parties, of CIGA's potential liability for attorney fees or punitive damages. In addition, because we conclude CIGA cannot be held liable for damages on a cause of action under the Unfair Practices Act, we do not reach the issue of whether there was a sufficient "conclusion" of the underlying action in this case to give rise to a section 790.03 claim, under *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329].

the physicians Ouellette consulted after his second operation. In addition, Dr. Redden indicated that if Ouellette underwent a fusion operation, "there was a 60% favorable chance of eliminating most of his disability with such a surgery" if it were performed using the dorsal approach, and "a 95% chance of success" if it were performed using the frontal approach. Redden definitely recommended surgery. Nonetheless, throughout the course of settlement negotiations, Ouellette refused to have corrective surgery.

B. *The Settlement With Ouellette*

While Imperial was still solvent, plaintiffs' counsel estimated that if a jury found Ouellette was totally disabled, the verdict could be "in the neighborhood of $750,000." Counsel informed Imperial that if the jury found that Ouellette was only partially disabled, then the verdict range would be near $375,000. Ouellette requested $1 million—the full extent of Imperial's coverage—to settle the case.

After Imperial was adjudged insolvent, and CIGA assumed plaintiffs' defense, CIGA retained the same law firm Imperial had already hired to defend plaintiffs against Ouellette's claim. Ouellette dropped his settlement demand to $500,000, the statutory limit of CIGA's coverage. (§ 1063.1, subd. (c)(6) [" 'Covered claims' shall not include that portion of any claim, other than a claim for workers' compensation benefits, which is in excess of five hundred thousand dollars ($500,000)"].)

After deposing most of Ouellette's expert witnesses, plaintiffs' counsel informed CIGA, "it is still [my] opinion that this case is a 50-50 proposition. The verdict value is approximately $750,000 in the event of an adverse verdict. It could go higher and it could come in for less. Because there is a substantial risk of an adverse verdict in excess of the [$500,000] policy limits that you have asserted, we must recommend and request that you tender your total coverage to [Ouellette] to settle this action."

CIGA's claim administrator replied, "I agree with your evaluation, as does the file, that the *liability is no worse than 50-50.* I also agree that the verdict could reach a $750,000 figure *if we disregard our defensive possibilities.* On that basis, a reasonable settlement value would not be more than $350,000." (Italics added.)

Plaintiffs then retained new counsel who demanded that CIGA tender its $500,000 limit to meet Ouellette's settlement demand. CIGA refused to pay more than $400,000. Finally, at the mandatory settlement conference, plaintiffs, at the suggestion of the settlement judge, and with CIGA's knowledge, agreed to pay $100,000 in addition to CIGA's $400,000 and

thus ensure a settlement. Plaintiffs then sued CIGA, seeking reimbursement for the amount they paid Ouellette, as well as compensatory and punitive damages for CIGA's alleged bad faith.

## C. *The Action Against CIGA*

Plaintiffs' second amended complaint purported to state three causes of action against CIGA. First, they sought to recover $100,000 on the theory that the entire settlement amount of $500,000 constituted a "covered claim" which CIGA was required to pay under the Guarantee Act. In the remaining causes of action they sought both compensatory and punitive damages for "bad faith" (apparently based on breach of the implied covenant of good faith and fair dealing) and intentional infliction of emotional distress. CIGA demurred to the causes of action for "bad faith" and intentional infliction of emotional distress. The trial court sustained the demurrer without leave to amend. The court relied on the absence of contractual privity between plaintiffs and CIGA for its ruling on the "bad faith" claim, and on plaintiffs' insufficient allegation of outrageous conduct on the emotional distress claim. For both causes of action it also cited section 1063.12, which limits CIGA's liability.[4] Plaintiffs later moved to amend their complaint to add an express cause of action for breach of the Unfair Practices Act. The trial court denied the motion, on the ground that the issue of CIGA's liability for bad faith had already been decided against plaintiffs.[5] On the claim for reimbursement of the $100,000 paid by plaintiffs, the court ultimately granted a nonsuit in favor of CIGA.

The Court of Appeal reversed. It held the trial court had erred in disallowing the cause of action based on violation of the Unfair Practices Act, and in granting the judgment of nonsuit on the reimbursement claim. It also concluded CIGA was subject to liability for damages for intentional infliction of emotional distress, although it held plaintiffs had abandoned that claim. We reverse the judgment of the Court of Appeal.

## II. DISCUSSION

### A. *CIGA's Immunity From Tort Liability*

Plaintiffs argue CIGA is liable for compensatory and punitive damages under three tort theories: violation of the Unfair Practices Act (§ 790 et

---

[4] Section 1063.12, subdivision (a), provides in pertinent part that CIGA "shall under no circumstances be liable for any sum in excess of the amount of covered claims of the insolvent insurer, as defined under subdivision (c) of Section 1063.1 of this article and the costs of administration and the costs of loss adjustment, investigation and defenses relating to claims thereunder."

[5] Both parties and the Court of Appeal addressed the issue of whether CIGA is liable under the Unfair Practices Act, and we consider the question here as well.

seq.), intentional infliction of emotional distress, and common law breach of the implied covenant of good faith and fair dealing. They base their argument on the premise that CIGA is "essentially the assignee" of the insolvent Imperial, and must accept the common law and statutory "burdens" of tort liability because it has accepted the "benefits" to which Imperial was entitled under the contract between Imperial and plaintiffs. In response, CIGA maintains that the Legislature, in creating CIGA to fulfill the quasi-public function of protecting insureds whose insurance companies become insolvent, gave it immunity from tort liability arising out of its handling of claims, in section 1063.12, subdivision (a). We conclude that the legislative intent and the relevant statutory provisions indicate that CIGA is immune from liability as to each of plaintiffs' tort claims.

CIGA was created by legislation in 1969 (§ 1063 et seq.) to establish a fund from which insureds could obtain financial and legal assistance in the event their insurers become insolvent, i.e. "to provide insurance against 'loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies.' (Ins. Code, § 119.5.)" (*Biggs* v. *California Ins. Guarantee Assn.* (1981) 126 Cal.App.3d 641, 644 [179 Cal.Rptr. 16]; see § 1063, subd. (a).) All insurers transacting insurance business in California are involuntary members of CIGA, unless specifically exempted by statute. (§§ 1063, subd. (a), 1063.1, subd. (a).)

CIGA undertook the plaintiffs' defense in this case pursuant to section 1063.2, subdivision (a), which directs CIGA to "pay and discharge *covered claims* and in connection therewith pay for or furnish loss adjustment services and defenses of claimants when required by policy provisions." (Italics added.) Section 1063.1, subdivision (c)(1), in pertinent part defines "covered claims" as "the obligations of an insolvent insurer, including the obligation for unearned premiums, (i) imposed by law and within the coverage of an insurance policy of the insolvent insurer; (ii) which were unpaid by the insolvent insurer; [and] (iii) which are presented as a claim to the liquidator in this state or to the association . . . ."

Section 1063.2, subdivision (f),[6] specifically provides, " 'Covered claims' shall not include any judgments against or obligations or liabilities of the insolvent insurer or the commissioner, as liquidator, or otherwise *resulting from alleged or proven torts* . . . ." (Italics added.) Finally, section 1063.12, subdivision (a), explicitly limits CIGA's liability, providing, "The association . . . shall *under no circumstances be liable for any sum in excess of the amount of covered claims* of the insolvent insurer . . . and the costs of administration and the costs of loss adjustment, investigation and defenses

---

[6] Now section 1063.2, subdivision (h). (See *ante*, fn. 1.)

relating to claims thereunder." (Italics added.) As explained below, we find the overall statutory scheme indicates a legislative intent that CIGA not be subject to tort liability for its conduct relating to the handling of claims, under any of the three theories plaintiffs espouse.

### 1. *Immunity Under the Unfair Practices Act*

Section 790.03, subdivision (h)(5), defines as an unfair business practice an insurer's knowing refusal to "attempt[] in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." ■ Plaintiffs argue that CIGA violated this subdivision, and is liable for damages under the Unfair Practices Act. They note the act explicitly applies to all "persons engaged in the business of insurance" (§ 790.01) and argue that CIGA falls within this definition. CIGA, on the other hand, asserts that the Legislature intended to make CIGA immune from liability for violations of the Unfair Practices Act.

The Court of Appeal concluded the Unfair Practices Act applied to CIGA. This holding conflicted with *Interstate Fire & Casualty Ins. Co.* v. *California Ins. Guarantee Assn.* (1981) 125 Cal.App.3d 904 [178 Cal.Rptr. 673]. In *Interstate,* a primary liability insurer with liability limits of $100,000 became insolvent and CIGA assumed the defense of the insured. The injured party obtained a judgment against the insured for $217,250, of which CIGA paid $100,000 and Interstate, the excess liability insurer, paid the balance. Interstate then sued CIGA, alleging CIGA had violated the Unfair Practices Act because it "had opportunities to settle the injury claim within the limits [of the insolvent insurer's policy] but . . . unreasonably failed to do so." (*Id.,* at p. 908.) The court sustained CIGA's demurrer to this claim without leave to amend.

Affirming the judgment, the *Interstate* Court of Appeal held that imposing Unfair Practices Act liability on CIGA would conflict with the Guarantee Act's explicit limitation on CIGA's liability. (§ 1063.12, subd. (a).) It found the broad, general language of the Unfair Practices Act insufficient to impose a duty "upon a unique and specialized association whose liability is expressly limited by its organic law." (125 Cal.App.3d at p. 912.) The court based its holding on three factors. The first was that the Guarantee Act was intended to provide "a limited form of protection for the public," but not to protect insurers when their competitors became insolvent. (*Ibid.*) Second, the court noted that section 1063.12, subdivision (a), gives CIGA a specific "grant of immunity," and stated, "Ordinarily such a specific and limited provision is deemed to control over any general statement, if there is a conflict. [Citations.]" (125 Cal.App.3d at pp. 912-913.) Third, insureds are protected from abusive practices by CIGA because the Insurance

Commissioner is "required by law both to enforce the Unfair Practices Act and to regulate and oversee CIGA." (*Id.,* at p. 914.) As the court observed, "This statutory relationship is such that the court is entitled to view the practices of CIGA as reflecting the Insurance Commissioner's interpretation of the applicable statutes." (*Ibid.*)

By contrast, in the present case, the Court of Appeal held that "[s]ection 1063.12 has no application to any judgment against CIGA based on its own tortious conduct." It found that CIGA could be held liable for breach of the Unfair Practices Act because CIGA "is engaged in the business of claims handling."

We reject this reasoning. As other courts have recognized, CIGA is not, and was not created to act as, an ordinary insurance company. (E.g., *Biggs supra,* 126 Cal.App.3d at p. 645.) It is a statutory entity that depends on the Guarantee Act for its existence and for a definition of the scope of its powers, duties, and protections. "CIGA is an involuntary, unincorporated association of insurers admitted to transact business in California. Each insurer is required to participate in CIGA as a condition of doing business in this state. The statutory purpose of CIGA is to provide for each insurer member insolvency insurance to pay the claims arising out of policies issued by an [insurer who becomes insolvent]. . . . Funds for the payment of such claims are obtained by collecting premium payments from its members. . . . CIGA is limited to the payment of 'covered claims' . . . ." (*In re Imperial Ins. Co.* (1984) 157 Cal.App.3d 290, 293 [203 Cal.Rptr. 664], fn. omitted.)

As the statute limits CIGA's authority to disburse funds to the payment of "covered claims," so does it limit CIGA's authority to collect funds. CIGA is required "[e]ach time an insurer becomes insolvent . . . [to] collect premium payments from its member insurers sufficient to discharge its obligations" but only "to the extent necessary to secure funds for the association *for payment of covered claims of that insolvent insurer* and also for payment of reasonable costs of adjusting the claims . . . ." (§ 1063.5, italics added.) Thus, the Legislature authorized CIGA to collect payments from its members only for the furtherance of its statutory duties of paying, adjusting, and defending "covered claims." The statute fails to provide any means by which CIGA could obtain funds to discharge adverse judgments if it were to be held liable for violations of section 790.03.

In addition, as noted, section 1063.12, subdivision (a), expressly restricts CIGA's liability, in the discharge of its statutorily circumscribed duties, to the amount of "covered claims." Under the provisions of the Guarantee Act, it is clear that, contrary to plaintiffs' contention, "CIGA . . . does not

'stand in the shoes' of the insolvent insurer for all purposes." (*Biggs, supra,* 126 Cal.App.3d at p. 645.)

The provisions of the Guarantee Act demonstrate CIGA is *not* in the "business" of insurance within the meaning of the Unfair Practices Act. CIGA issues no policies, collects no premiums, makes no profits, and assumes no contractual obligations to the insureds. Its "business" is providing insureds with a limited form of protection from financial loss occasioned by the insolvency of their insurer. Given the clearly delineated scope of CIGA's role as set forth in the Guarantee Act, and the express restriction of CIGA's liability in section 1063.12, subdivision (a), we conclude the Legislature did not intend CIGA to be liable for violations of the Unfair Practices Act.

Additional factors support the conclusion that the Legislature intended to grant CIGA immunity from liability under section 790.03. First, the Legislature did not make CIGA liable under the Unfair Practices Act when it amended the Guarantee Act after the decision in *Interstate,* supra, 125 Cal.App.3d 904. The Legislature amended sections 1063.1 and 1063.2 in 1983, 1984, and 1987, but has taken no action to alter the statutory immunity of CIGA. Nor did the Legislature provide for such liability when it amended section 790.03 in 1983, specifically in response to another court decision.[7]

Second, the protective function served by the Unfair Practices Act is less necessary with CIGA than with an ordinary insurer. Because CIGA is not a private, profit-oriented enterprise, it does not gain financially by refusing to defend or settle claims. It therefore lacks economic incentive to deal unfairly with insureds. Essentially, CIGA provides an added benefit to insureds; without CIGA, once an insurer became insolvent, its insureds would be deprived of any benefits or indemnification for claims that would have been covered under the policy of the insolvent insurer.

In addition, we note that in order to help insureds whose insurers become insolvent cover their losses, CIGA in effect spreads the loss among other insureds, in the form of increased costs to the insurance-buying public.

---

[7]Upon enacting the 1983 amendment to section 790.03, the Legislature stated: "The United States Supreme Court decison in Arizona Governing Committee v. Norris, interpreting Title VII of the Civil Rights Act of 1964, became effective August 1, 1983. In order for life insurers to continue to offer insured benefits on an individual basis for persons affected by this decision in California, it is necessary that this act take effect immediately." (Stats. 1983, ch. 1261, § 2, quoted in 42 West's Ann. Ins. Code (1988 pocket supp.) § 790.03, p. 76.) Thus, the Legislature demonstrated its sensitivity to the effect of court interpretations on liability under section 790.03. As noted, it made no similar move to disavow the Court of Appeal's interpretation in *Interstate, supra,* 125 Cal.App.3d 904.

Section 1063.14, subdivision (a), provides in relevant part, "each member insurer is required to recoup . . . the assessments paid by the member insurer under this article by way of a surcharge on premiums charged for insurance policies to which this article applies." The Guarantee Act thus causes insureds generally to subsidize CIGA's payments to policyholders of insolvent insurers for their "covered claims." It demonstrates no intent to require the insurance-buying public similarly to pay for damage awards obtained against CIGA for violations of the Unfair Practices Act.

In sum, in the absence of evidence of a contrary legislative intent, we conclude that *Interstate, supra,* 125 Cal.App.3d 904, correctly held that the Guarantee Act, specifically section 1063.12, subdivision (a), grants CIGA immunity from tort liability for its actions in fulfilling its statutory duties to pay and discharge claims against insolvent insurers, and that the Guarantee Act language controls over the general language of the Unfair Practices Act, which imposes liability on those in the "business of insurance."[8]

### 2. *Intentional Infliction of Emotional Distress*

■ We also conclude that CIGA is not subject to tort liability for intentional infliction of emotional distress arising from its conduct in the course of claims adjustment. As we have discussed, not only does section 1063.12, subdivision (a), provide that CIGA is not liable for payments in excess of "covered claims," CIGA also lacks any means of paying adverse tort judgments arising out of the adjustment of claims, and it is not authorized to collect funds for such purposes. We believe that if the Legislature had intended CIGA to be liable for damages based on intentional infliction of emotional distress in the claims adjustment context, it would have authorized CIGA to pay such damages awards, and provided a means of collecting funds to cover them.

We also find that in any event the trial court correctly concluded plaintiffs failed to allege facts sufficient to support a cause of action for intentional infliction of emotional distress. Plaintiffs based this claim on a letter from CIGA to plaintiffs' counsel, which stated that because $350,000 was a reasonable settlement considering their "defensive possibilities," any settlement by plaintiffs in excess of $500,000 would be unwarranted and "a possible policy violation and a breach of good faith." Plaintiffs contended that this letter, in addition to CIGA's failure to pay more than $400,000,

---

[8] If CIGA abuses this immunity in a future case, relief may be sought from the Insurance Commissioner, who is responsible for regulating and overseeing CIGA, or from the Legislature, which may, for example, divest CIGA of the tort immunity it currently enjoys or provide a scheme whereby tort damages may be recovered against CIGA. Under the present scheme, however, CIGA's liability is limited as we have set forth.

caused them "extreme emotional upset and turmoil." The actions alleged fall short of conduct " 'so extreme as to exceed all bounds of that usually tolerated in a civilized community.' [Citation.]" (*Ricard* v. *Pacific Indemnity Co.* (1982) 132 Cal.App.3d 886, 895 [183 Cal.Rptr. 502].) The trial court correctly sustained CIGA's demurrer. (See, e.g., *Schlauch* v. *Hartford Accident & Indemnity Co.* (1983) 146 Cal.App.3d 926, 936 [194 Cal.Rptr. 658]; *Everfield* v. *State Comp. Ins. Fund* (1981) 115 Cal.App.3d 15, 20 [171 Cal.Rptr. 164]; cf. *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 209-210 [185 Cal.Rptr. 252, 649 P.2d 894].)

### 3. *Common Law Bad Faith*

■ Plaintiffs also assert that CIGA should be liable for common law bad faith, that is, for breach of the implied covenant of good faith and fair dealing. The trial court sustained CIGA's demurrer to this claim without leave to amend, based on both lack of contractual privity between plaintiffs and CIGA, and CIGA's immunity under section 1063.12. The Court of Appeal agreed that CIGA could not be liable for nonstatutory breach of good faith and fair dealing because of the lack of privity. Before this court plaintiffs renew their claim that CIGA is liable for common law bad faith because it is "essentially the assignee of policy obligations that the insolvent insurer (Imperial) owed to the insureds."

We find the trial court was correct on both grounds. An implied covenant of good faith and fair dealing arises only from a contractual relationship, not a statutory one. (*Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 943-944 [132 Cal.Rptr. 424, 553 P.2d 584]; *Coleman* v. *Gulf Ins. Group* (1986) 41 Cal.3d 782, 794-795 [226 Cal.Rptr. 90 [718 P.2d 77]; see *Trunk* v. *Orr* (1979) 94 Cal.App.3d 761, 764, 156 Cal.Rptr. 662].) We held in *Murphy,* and reaffirmed in *Coleman,* that in the absence of a contractual relationship a nonstatutory bad faith action against an insurer by a third party claimant will not lie. Similarly here, CIGA and plaintiffs were not in contractual privity. In addition, section 1063.12, subdivision (a), grants CIGA immunity with respect to its handling of claims for any amount in excess of "covered claims." Accordingly, the trial court properly sustained CIGA's demurrer to plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

### B. *CIGA's Liability for Reimbursement Within the Statutory Limits*

### 1. *Cause of Action for Reimbursement*

We hold in part A above that the Guarantee Act shields CIGA from liability for damages for common law and statutory bad faith and

intentional infliction of emotional distress, by virtue of its limitation of CIGA's obligations to the payment and discharge of "covered claims." We do not mean to imply that the statute precludes an insured from recovering reimbursement from CIGA, within the statutory limits,[9] in the event CIGA breaches its duties under the Guarantee Act to defend or pay a "covered claim." ■ If CIGA fails to comply with the foregoing statutory duties, thus inducing the insured to pay money to satisfy an adverse judgment[10] or to settle (or augment settlement of) the claim against him, the insured, on proving that CIGA breached its duty toward him, is entitled to recover the money expended, up to the statutory maximum.

In this case, plaintiffs asserted such a reimbursement claim. They contended the entire $500,000 settlement was a "covered claim" that CIGA was required to pay. They argued CIGA should have agreed to settle for its $500,000 statutory limit, and that it breached its duty by refusing to do so.

The trial court ruled that plaintiffs could collect reimbursement from CIGA only if they could prove that they were liable in the underlying malpractice action, and that their liability to Ouellette exceeded the $400,000 that CIGA had already paid to settle. Rather than trying to prove their own liability, plaintiffs elected to make an offer of proof to demonstrate their theory that CIGA had acted improperly by failing to pay the entire $500,000 in settlement. In their offer of proof, plaintiffs set out the history of the settlement negotiations in the Ouellette action. (See *ante* at pp. 782-783.) The evidence established $750,000 as the estimated maximum jury verdict, and no offered document or testimony evaluated the chance of a verdict against them as greater than 50 percent. The trial court then granted CIGA's motion for nonsuit on the ground plaintiffs had not proved they were liable to Ouellette for a sum in excess of the $400,000 paid by CIGA.

The Court of Appeal reversed, holding that the $500,000 settlement was presumptive evidence of the extent of plaintiffs' liability, and that unless CIGA proved bad faith by plaintiffs or collusion between them and Ouellette, it was required to pay the entire $500,000 by reimbursing plaintiffs for their $100,000 settlement contribution. It based this holding in part on its finding that plaintiffs' offer of proof demonstrated the "bad faith" of CIGA.

We conclude that the reasoning of both courts below was erroneous in some respects. ■ The trial court was incorrect in holding that plaintiffs

---

[9] The Guarantee Act limits the amount of a "covered claim" payable by CIGA to a sum within "any applicable limits provided in the insurance policy issued by the insolvent insurer" up to a maximum of $500,000. (§ 1063.1, subds. (c)(5), (c)(6).) CIGA's liability for reimbursement is thus limited to the lesser of $500,000 or the underlying policy limit.

[10] We limit our discussion to the context of a claim by an insured pursuant to a liability policy, where a third party has asserted a claim against the insured.

were required to prove their own liability in the underlying malpractice action before they could recover reimbursement for their settlement. The court's judgment of nonsuit was correct, however, for reasons we will discuss, and the Court of Appeal erred in reversing it.

2. *CIGA's Duty Under the Guarantee Act to Provide Coverage and a Defense*

The Guarantee Act requires CIGA to "pay and discharge covered claims and in connection therewith pay for or furnish loss adjustment services and defenses of claimants when required by [the insolvent insurer's] policy provisions." (§ 1063.2, subd. (a).) Payment on a "covered claim" is an obligation that arises out of the insurance contract between the insured and the insolvent insurer, and one CIGA assumes when the member insurer becomes insolvent. (§ 1063.1, subd. (c)(1).) Although CIGA is not a private insurer, and has no contractual relationship with the insured, we recognize that the scope of its obligation to pay and defend claims is defined in terms of the underlying insurance policy provisions. We therefore refer to the contractual duties of an insurer, in defining the scope of CIGA's statutory duties.

An insurance company "bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy." (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 276-277 [54 Cal.Rptr. 104, 419 P.2d 168].) Wrongful failure to provide coverage or defend a claim is a breach of contract. (See *California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 35-39 [221 Cal.Rptr. 171]; *Clark* v. *Bellefonte Ins. Co.* (1980) 113 Cal.App.3d 326, 335-336 [169 Cal.Rptr. 832].) Accordingly, if an insurer "erroneously denies coverage and/or improperly refuses to defend the insured" in violation of its contractual duties, "the insured is entitled to make a reasonable settlement of the claim in good faith and may then maintain an action against the insurer to recover the amount of the settlement . . . ." (*Clark, supra,* 113 Cal.App.3d at p. 335.)

Further, if an insurer wrongfully fails to provide coverage or a defense, and the insured then settles the claim, the insured is given the benefit of an evidentiary presumption. In a later action against the insurer for reimbursement based on a breach of its contractual duty to defend the action, a reasonable settlement made by the insured to terminate the underlying claim against him may be used as presumptive evidence of the insured's liability on the underlying claim, and the amount of such liability. (*Kershaw* v. *Maryland Casualty Co.* (1959) 172 Cal.App.2d 248, 256-257 [342 P.2d 72]; see *Ritchie* v. *Anchor Casualty Co.* (1955) 135 Cal.App.2d

245, 250 [286 P.2d 1000] and *Lamb* v. *Belt Casualty Co.* (1935) 3 Cal.App.2d 624, 631-632 [40 P.2d 311].)

■ Therefore, if CIGA improperly denies coverage or refuses to defend an insured on a "covered claim" arising under an insolvent insurer's policy, it breaches its statutory duties under the Guarantee Act. Furthermore, if the insured, after such a breach by CIGA, pays an adverse judgment, or contributes a reasonable amount in settlement of the claim, the insured has a cause of action against CIGA for reimbursement. In such a case, a reasonable settlement made by the insured with the third party claimant raises a presumption that the insured was liable in the amount of the settlement, as is the law with respect to private insurance carriers.

3. *Duty to Accept a Reasonable Settlement Offer*

There can be an action for reimbursement also when there is no denial of coverage or refusal to defend, but instead a refusal to settle. ■ Although CIGA's obligations are imposed by the Guarantee Act, and not by a contractual relationship with the insured (or the Unfair Practices Act), we hold that CIGA's statutory duty to defend and pay "covered claims" encompasses a duty to accept a reasonable settlement offer in appropriate cases.[11] If CIGA fails to accept a reasonable settlement offer within its statutory limit, in a case in which a judgment against the insured in excess of that limit is likely, it violates its statutory duty to pay and discharge "covered claims."[12] It may thereby become liable to the insured for reimbursement if the insured expends his own funds to settle, within the statutory limit.

In reaching our decision, we emphasize that the Guarantee Act does not require CIGA to pay $500,000 on every liability claim without considering the various strengths or weaknesses of the case against the insureds and the potential size of a judgment against them. CIGA is not required to provide maximum coverage in every case in which there is some *possibility* that the

---

[11] Cf. *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659 [328 P.2d 198, 68 A.L.R.2d 883] (a private insurance carrier has a duty "to settle in an appropriate case"); *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 430 [58 Cal.Rptr. 13, 426 P.2d 173] (an insurance company may incur liability for "unwarrantedly refus[ing]" an offered settlement where the most reasonable manner of disposing of the claim is by accepting the settlement").

[12] Cf. *Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 16 [123 Cal.Rptr. 288, 538 P.2d 744] (acceptance of a settlement offer within an insurer's policy limits will be the most reasonable manner of disposing of a claim "whenever it is likely that the judgment against the insured will exceed policy limits"). The reasonableness of a settlement offer is to be evaluated by considering whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer. (*Ibid.*)

damages could exceed $500,000. Rather, its duty is to pay and defend "covered claims" (which necessarily includes paying a *reasonable* amount in settlement), based on a fair appraisal of potential exposure and the strength of each case.

Determination of the reasonableness of a settlement offer for purposes of a reimbursement action is based on the information available to CIGA at the time of the proposed settlement. (Cf. *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499 [213 Cal.Rptr. 256, 698 P.2d 159].) In order to recover reimbursement from CIGA following its refusal to settle a claim, an insured must prove that CIGA breached its duty to settle the case for a reasonable amount. The insured need not prove his actual liability on the underlying claim, and establishing a breach does not require a trial of the underlying action. On this point the trial court in the present case erred. Plaintiffs here did not have to prove their own liability to Ouellette in order to recover from CIGA. ▮ Instead, reimbursement required proof that CIGA failed to accept a reasonable settlement offer on a "covered claim," a fact the plaintiffs failed to establish.

Plaintiffs had the burden of proving that the $500,000 settlement demand CIGA rejected was reasonable under the circumstances of the claim. Once they established a breach of the duty to accept a reasonable settlement offer, they could then proceed to prove damages, based on the amount of the settlement they entered into. The Court of Appeal, however, treated the settlement as presumptive evidence that plaintiffs were liable to Ouellette for damages in the amount of $500,000, effectively implying that $500,000 was a reasonable amount in settlement, and that CIGA would therefore be liable for reimbursing plaintiffs for their $100,000 contribution.[13]

The Court of Appeal's conclusion that the settlement had a presumptive effect under *Lamb, supra,* 3 Cal.App.2d 624, 631-632, is erroneous. This case is factually distinguishable from cases in which the presumption described in *Lamb* applies. The presumption operates where the insurer has wrongfully refused to cover or defend a claim, leaving the insured to mount his own defense or suffer a default. In order to recover reimbursement from the insurer, the insured must demonstrate that the claim was covered under the policy in question, or that the insurer breached its duty to defend. Once a breach of contract is proved, the insured's act of settling the claim is said to raise the presumption that the third party's claim against him was

---

[13]To the extent that its treatment of the settlement as presumptive evidence of plaintiffs' underlying liability was based on an erroneous belief that a determination of plaintiffs' liability was a prerequisite to their recovering reimbursement, the court confused the issues. As we explain, the reimbursement claim depends not on proof of liability, but on proof that CIGA failed to accept a reasonable settlement offer.

legitimate, and that he was liable in the amount which he agreed to pay in settlement. (*Ibid.*) Here, however, CIGA *never denied coverage,* nor did it refuse to defend plaintiffs in the malpractice case, and it also agreed to participate in the final settlement by paying $400,000. Plaintiffs themselves elected to protect their reputations and avoid potential liability exposure by contributing $100,000 to settle, rather than try the case.

An insured is not entitled to additional benefits simply because a third party claimant is unwilling to offer or accept a reasonable settlement. On the facts of this case, where there was no denial of coverage or refusal to defend, there is no reason to give the insureds the benefit of a presumption that Ouellette's claim against them was worth a $500,000 settlement, or that the $500,000 settlement offer was reasonable. As stated earlier, proof of the reasonableness of the settlement depends on the facts known at the time of settlement, and not on the amount of the ultimate settlement as contributed to by the insureds as well as CIGA.

Moreover, holding that the settlement offer created a presumption as to the value of the third party's claim and thus a presumption as to the reasonableness of the total settlement amount on facts such as these would discourage future settlements generally, and reasonable settlements for less than policy limits specifically, in contravention of well established public policy. (See *People* ex rel. *Dept. Public Works* v. *Forster* (1962) 58 Cal.2d 257, 263 [23 Cal.Rptr. 582, 373 P.2d 630]; 7C Appleman, Insurance Law and Practice (Berdal ed. 1979) § 4711, p. 367.)[14]

As we have said, the judgment of nonsuit was correct, because plaintiffs failed to offer evidence of sufficient substantiality that CIGA breached its statutory duties in refusing to pay $500,000 in settlement. The evidence offered by plaintiffs shows a medical malpractice case of uncertain liability and damages. An estimated maximum exposure of $750,000 was about a 50 percent possibility. This evidence does not indicate that CIGA failed to accept a reasonable settlement offer when it rejected Ouellette's $500,000 settlement demand, and instead paid $400,000. Thus, in the absence of a showing that CIGA breached its statutory duties, plaintiffs are not entitled to reimbursement.

---

[14] To hold that the settlement created a presumption that plaintiffs were *liable for malpractice* would also run counter to other legal and public policy considerations. Such a treatment would disregard the general rule that a settlement does not act as an admission of liability of either the insured or the insurer. (See *Rodriguez* v. *Fireman's Fund Ins. Co.* (1983) 142 Cal.App.3d 46, 55 [190 Cal.Rptr. 705].) It would conflict also with Evidence Code section 1152, subdivision (a), which provides that evidence of settlement or compromise is inadmissible to prove the liability of the settling party. A party may reasonably wish to settle a claim even though he believes he is not liable; indeed, a major advantage of settling is that one may terminate a lawsuit *without* admitting liability.

### III.  CONCLUSION

We conclude CIGA is immune from tort liability for violation of the Unfair Practices Act, for intentional infliction of emotional distress, and for common law bad faith, arising from its conduct in the claims adjustment process. CIGA's liability in this context is limited by statute to the payment and discharge of "covered claims," including payment of a reasonable amount in settlement, up to a maximum of $500,000. In this case, plaintiffs have failed to prove that CIGA breached its statutory duties, and thus they are not entitled to recover reimbursement from CIGA.

The judgment of the Court of Appeal, reversing the trial court's judgment of nonsuit, is reversed.

Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.**—I dissent.

An analysis of the record clearly reveals that the California Insurance Guarantee Association (CIGA) did not stubbornly refuse to settle this case on the basis of the facts involved, but took its unrelenting stand in order to deter future demands in future cases brought by future parties. Indeed the CIGA representative candidly communicated that attitude: "unless we stand firm right now we will be forced, on the fear of bad faith, to pay $500,000 on every malpractice claim regardless of negligence." In my view it is the duty of a court to consider only the facts of the case before it. If we do so dispassionately here, the conclusion is inescapable that CIGA should have paid its policy limits to the seriously injured plaintiff.

The self-protective settlement negotiated by the defendant doctors, after CIGA refused to contribute more than $400,000 to satisfy plaintiff's demands, appears to have been reasonable under the circumstances. While CIGA constantly refers to a potential maximum liability of $750,000 and only a 50-50 chance of plaintiff prevailing, it conveniently overlooks the communication from counsel for Imperial Insurance Company (Imperial) whom it also retained: "The verdict value is approximately $750,000 in the event of an adverse verdict. *It could go higher* and it could come in for less. Because *there is a substantial risk of an adverse verdict in excess of the policy limits* that you have asserted, we must recommend and request that you tender your total coverage to plaintiff to settle this action." (Italics added.)

The foregoing objective advice from CIGA's own counsel in this matter follows a previous communication from him: "The liability picture is

beginning to favor plaintiff and the damages are potentially very extensive. You should be prepared for a policy limits demand. The case has that kind of jury verdict potential." A subsequent letter from defense counsel to CIGA referred to a physician's report that indicated plaintiff in his present condition "is totally and permanently disabled."

Contrary to the majority view, CIGA is in the insurance business and is bound by the rules that govern insurance companies. While it is not a direct insurer of policyholders, it is an insurer of insurance companies and hence indirectly of their policyholders. That is insurance business, pure and simple. Thus CIGA does not have the moral or legal right to gamble with the resources of its insured's policyholders, anymore than Imperial had such right to so gamble in reliance on the "no action" clause in the small print of the policy. Yet that is precisely what CIGA maintains it could do in this case, and presumably in other cases with which it appears to be concerned.

As Chief Justice Gibson held for a unanimous court in *Communale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 660-661 [328 P.2d 198 [68 A.L.R.2d 883], a carrier that refuses to make "an advantageous settlement when there is a great risk of liability in excess of the policy limits" is liable to its insured for all damage "even if it exceeds the policy limits." The New York Court of Appeal put it succinctly: "the insurer's obligation to act in good faith for the insured's interests may be breached in other ways than by refusing or neglecting to defend a suit. It may be breached by neglect and failure to act protectively when the insured is compelled to make settlement at his peril; . . ." (*Isadore Rosen & Sons, Inc.* v. *Security Mutual Ins. Co.* (1972) 31 N.Y.2d 342 [339 N.Y.S.2d 97, 291 N.E.2d 380, 382].)

CIGA was insistent on going to trial, contrary to the recommendation of its own counsel, in the fond hope that it might prevail. It was not acting protectively of the insured. If CIGA won, the gamble paid off. If it lost, the gamble still paid off because it was responsible for only the same $500,000 being demanded for settlement. The only losers in the latter scenario would be the insured doctors, who would have been required to pay that portion of the judgment above the $500,000—a judgment potential estimated to be $750,000, more or less, and one that could have reached the $1 million originally demanded by plaintiff as the cost of settlement with Imperial. The proposed gamble with the doctors' resources clearly established a prima facie case of bad faith. Yet the majority inexplicably approve a nonsuit.

Despite the majority's tortured reading of the statute creating CIGA, I cannot agree that the Legislature intended to insulate this agency from all tort liability. If a motorist employee of CIGA, in the course of his employment, were to negligently strike a pedestrian in a crosswalk, CIGA should

be held liable under traditional respondeat superior doctrine. And if CIGA should be held liable for a negligent act, a fortiori it should be held liable for an intentional tort. Unless the Legislature were to spell it out with particularity, I cannot believe that in this day and age it intends that any entity, even one it creates by statute, be permitted to commit intentional torts with complete immunity. The majority opinion elevates CIGA above the law that binds every other individual, corporation—and insurance company. A rare and exalted position indeed, but frightening to contemplate.

The majority dwell at length on the purported inability of CIGA to obtain the funds with which to pay a tort judgment. I am not at all certain that their apprehensions are justified. But in any event the ability of a tort defendant to satisfy a judgment is wholly irrelevant to its legal liability. Countless plaintiffs hold uncollectable judgments, but they were not denied the opportunity to have their claims adjudicated in a court of law.

In short, this case should have proceeded to trial and judgment. While it is true, as the majority observe, that a settlement is not always an admission of liability, more than a half century ago the general rule was set forth in *Lamb* v. *Belt Casualty Co.* (1935) 3 Cal.App.2d 624, 631-632 [40 P.2d 311]: "The settlement, or a judgment rendered upon a stipulation of such a settlement, becomes presumptive evidence only of the liability of the insured and the amount thereof, which presumption is subject to being overcome by proof on the part of the insurer." (See also *Ritchie* v. *Anchor Casualty Co.* (1955) 135 Cal.App.2d 245, 250 [286 P.2d 1000].) Thus the doctors should have been allowed to introduce the settlement as presumptive evidence of liability, and any evidence in support of the reasonableness of the settlement amount; in defense CIGA could have produced any evidence it has to establish collusion or other indicia of bad faith in the fact of settlement or the amount thereof; and the trier of fact could then have determined which party is to prevail.

The desirability of this trial proceeding on the merits is underscored by the fact that the settlement judges who considered the contentions of the parties at the trial level expressed the belief that CIGA may have acted in bad faith.

With remarkable obfuscation, the majority in footnote 2 deny they are insulating CIGA from tort liability.[1] Yet they insist CIGA cannot be liable for anything other than the covered claims of the insolvent insurer, and

---

[1] The confusion of the majority is emphasized by their reliance on section 1063.12, subdivision (b) to protest they are really not insulating CIGA from tort liability. That section refers only to individuals who may have served on the board or committees of CIGA and their potential liability. It is irrelevant to causes of action against CIGA.

throughout their opinion they refer to CIGA's tort immunity. Future tort victims of CIGA will have no clear picture of their legal rights.

Instead of allowing a full and fair trial, as did the Court of Appeal, the majority and the trial court decide this controversy by nonsuit. The result appears to be unjust in this case. More ominously, the opinion can be read to insulate CIGA from all intentional torts—indeed, all torts. I can only hope the Legislature promptly acts to make it clear that no agency is above the law.

Respondent's petition for a rehearing was denied April 6, 1988, and the opinion was modified to read as printed above.