92 Cal.Rptr.2d 174 (2001)
77 Cal.App.4th 916
DART INDUSTRIES, INC., Plaintiff and Respondent,
v.
COMMERCIAL UNION INSURANCE COMPANY, Defendant and Appellant.
No. B129601.
Court of Appeal, Second District, Division One.
January 25, 2000.
Review Granted May 24, 2000.
*175 Selman Breitman, Neil H. Selman, Jeffrey C. Segal, Los Angeles, and Lynette Klawon, for Defendant and Appellant.
Luce, Forward, Hamilton & Scripps, James E. Fitzgerald, Los Angeles; Jenner & Block and Stephanie A. Scharf, Chicago, IL, for Plaintiff and Respondent.
MIRIAM A. VOGEL, J.
This is a dispute between an insured (Dart Industries, Inc.) and its insurer (Commercial Union Insurance Company) about a policy that was in effect from 1946 to 1951. The policy, last seen in 1948, is missing. At trial, Dart claimed Commercial was obligated to defend and indemnify Dart in more than 1,500 product liability lawsuits. Commercial claimed (among other things) that Dart had failed to present sufficient proof of the terms and conditions of the missing policy. The trial court agreed with Dart. We agree with Commercial and explain that, although it is possible to prove the contents of a lost policy by secondary evidence, Dart did not do so in this case. Commercial is entitled to a judgment in its favor.

FACTS
From the 1940's through the 1960's, Dart's predecessor distributed diethylstilbestrol (DES), an artificial hormone used to prevent miscarriages. Beginning in 1974, more than 1,500 lawsuits were filed against Dart, all claiming DES-related bodily injuries. Dart tendered the defense of the DES suits to the several companies that had insured it during the relevant years, including Commercial's predecessor. Commercial denied coverage and refused to provide a defense. In 1984, Dart filed this action against Commercial and others, seeking declaratory relief and damages for breach of contract.[1]
In 1989, Dart's motion for preference in trial setting was denied and the case was dismissed for failure to bring it to trial within five years. (Code Civ. Proc., §§ 583.310, 583.360, subd. (a).) On Dart's appeal, we reversed. (Dart Industries, Inc. v. Commercial Union Ins. Co. (Feb. 28, 1992, B047651) [nonpub. opn.].) The case was then tried before Judge Newell Barrett, who entered a minute order in which he ruled in favor of Commercial on the ground that Dart had failed to prove the material terms of the lost policy. Dart requested a statement of decision and a draft was prepared, but Judge Barrett died before it was executed. On Dart's appeal, we reversed and remanded for a new trial. (Dart Industries, Inc. v. Commercial Union Ins. Co. (May 26, 1995, B083165) [nonpub. opn.].)
By stipulation, the new trial was by way of a submission to the court (Hon. Loren Miller) on the record of the first trial, with the evidence expressly limited to that which had been admitted by Judge Barrett. There were several critical issues, all detailed in new briefs submitted by both *176 sides. The trial court decided all factual and legal issues in favor of Dart, finding in its statement of intended decision that, in the DES product liability cases, Commercial had a duty to pay 50 percent of Dart's defense costs, 50 percent of Dart's settlements, and 50 percent of any awards and judgments in favor of the claimants "for bodily injuries allegedly sustained by claimants as a result of the ingestion of ... DES ... during the 1946-1951 ... policy period...." Commercial requested a statement of decision. The trial court asked Dart's lawyers to prepare it. When a proposed statement was filed and served, Commercial objected on several grounds. The trial court nevertheless signed the statement of decision as submitted.
Commercial appealed and we reversed, finding the statement of decision wholly inadequate. (Dart Industries, Inc. v. Commercial Union Ins. Co. (June 27, 1997, B105886) [nonpub. opn.].) We remanded the cause to the trial court with directions to issue a new statement of decision addressing, among other things, the limits of liability for products liability claims (assuming the court found that the policy covered products liability claims), whether the missing policy was accident-based or occurrence-based, and the applicable trigger of coverage.
Following remand, Dart submitted a new proposed statement of decision. Commercial objected, in detail. Dart responded with a 30-page revised proposed statement of decision. Commercial objected again. After a hearing, the trial court signed Dart's revised proposed statement of decision without making a single change. Not a nit was picked. Not a comma was moved. The statement of decision includes the following findings: "[Commercial] issued [Dart] a policy for a five-year term covering the period September 1, 1946 to September 1, 1951." The "Policy issued to [Dart] included coverage for product liability claims for bodily injuries occurring during the policy period." The "Policy provided coverage for exposure to a [Dart] drug during the Policy period even if injuries caused by that exposure were not discovered until after the policy ended." The "Policy provided occurrence based coverage." "Whether the ... Policy had `accident' or `occurrence' coverage does not affect the DES claims." The "limits of coverage under the ... Policy are $100,000 per person and $300,000 per occurrence." "In the context of product liability cases, ... this would mean that if a product, such as DES, caused injury to the mother and subsequently to her two offspring (who allegedly sustained damage as the result of exposure to DES in utero) and all three of them later sued [Dart] for damages, the insurer's limits would be $100,000 per each of the three claimants up to a maximum limit of $300,000 for that lawsuit." The "Policy had a products aggregate with limits of $300,000 on a per year basis." The "Policy did not contain any deductible applicable to products liability coverage, or any coverage."
In the statement of decision and in the judgment, the trial court fixed Dart's damages at about $1.9 million for "local defense costs," about $260,000 for "indemnities," and about $550,000 for "national defense costs," for a total of about $2.7 million, plus prejudgment interest (through December 1992) of about $1.4 million. Commercial appeals.

DISCUSSION

A. The Evidence

Dart's proof of the policy's terms and conditions came from the testimony of Charles Pyne (a former employee of Dart's former insurance broker who last saw the missing policy in 1948) and Peter Fortuna (a former employee of Commercial who had handled Dart's account during the 1940's but who had no recollection at all of the language used in the policy), and from four one-page documents found in the broker's old records, plus a few scattered documents from two unrelated lawsuits. A 1970 letter from Dart's former insurance broker explained that the broker's old files had been discarded. Generously constried, *177 Dart's evidence proves that Commercial issued a Comprehensive General Liability (CGL) policy to Dart in 1946. It was a "manuscript" policy (defined by Pyne as one "typed up ... specifically" for the insured), "custom tailored" for Dart (it "might" have been attached to a "standard policy"). Pyne (who was not involved in negotiating, drafting or issuing the policy, who may or may not have read the policy's declaration page, and who admitted that he never read the policy itself) testified that it was an "occurrence" policy covering personal injury and product liability claims, with limits of $100,000 per person and $300,000 per accident or occurrence (but there is no evidence of the policy's language and no evidence to support Pyne's conclusory assertion that it was an "occurrence" policy).[2] According to Pyne, there was a separate provision covering defense costs for which there was no monetary limit. There was no deductible. Although Pyne testified that Dart paid more than $1.3 million in premiums for the lost policy, he admitted that more than $1 million of that premium was for workers' compensation coverage.
That's all there is. There is no evidence at all concerning the words used in the policy. There is no evidence to show what sort of language was used by Commercial (in standard or manuscript policies or at all) at the time Dart's policy was issued (or at any time). There is no evidence to show what sort of language was used in the industry at the time Dart's policy was issued (or at any time). There is no evidence to show what standard provisions, if any, were required by statute at the time Dart's policy was issued, or what standardized provisions, if any, were usually incorporated into Commercial's CGL policies (in the 1940's or at any time). Although a "specimen policy" was offered into evidence by Commercial at the time of the first trial before Judge Barrett, that policy was not admitted into evidence. By stipulation, the only evidence before Judge Miller at the current trial was the evidence admitted by Judge Barrett at the first trial. Accordingly, the numerous references to the "specimen policy" in the statement of decision (drafted by Dart and accepted by Judge Miller) are legally irrelevant.[3]

B. The Evidentiary Burden

To establish Commercial's duty to defend the DES claims, the burden was on Dart, the insured, to prove that the DES claims were potentially covered under the lost policy. Montrose Chemical Corp. v. Superior Court (1993) 6 Cal.4th 287, 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.) Without foundational findings (supported by substantial evidence) that Commercial both owed and breached a duty to defend the DES claims, it was Dart's burden to prove Commercial's duty to indemnify *178 by presenting evidence to establish that the DES claims were within the scope of the policy's basic coverage. (Aydin Corp. v. First State Ins. Co. (1998) 18 Cal.4th 1183, 1188, 77 Cal.Rptr.2d 537, 959 P.2d 1213; Royal Globe Ins. Co. v. Whitaker (1986) 181 Cal.App.3d 532, 537, 226 Cal.Rptr. 435; cf. Isaacson v. California Ins. Guarantee Assn. (1988) 44 Cal.3d 775, 791, 244 Cal.Rptr. 655, 750 P.2d 297.)[4] More fundamentally, the burden was on Dart, the insured, to establish the policy's existence and its material terms. (Searle v. Allstate Life Ins. Co. (1985) 38 Cal.3d 425, 438, 212 Cal.Rptr. 466, 696 P.2d 1308; Nat. American Ins. Co. of Cal. v. Underwriters (9th Cir.1996) 93 F.3d 529, 534 [under California law, it is the insured's burden to prove "both the existence of the insurance contract, and its material terms"]; see also Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1999) ¶ 15:924, p. 15-161.)

C. Proof of a Lost Contract

The contents of a lost document may be proved by secondary evidence if it is sufficient to "clear[ly] and certain[ly]" show "all the contents of the [lost document], not literally, but substantially" (Kenniff v. Caulfield (1903) 140 Cal. 34, 44, 73 P. 803) or, put differently, if it is "sufficient to show without reasonable doubt its substantial parts" (Deacon v. Bryans (1928) 88 Cal.App. 322, 325, 263 P. 371). Secondary proof of the duties and obligations imposed upon the parties to a lost contract "should be clear," and "not of a doubtful character in probative worth," with the proponent's burden carrying "more than the usual measure of responsibility" to counter "the treachery of human memory." (Caine v. Briscoe (1926) 78 Cal. App. 660, 669, 248 P. 774.) Where, as here, there exists no copy of the lost original, the witnesses need not recite its contents "word for word," but they must be able to demonstrate that they are "intelligent witnesses who had read the paper, understood its object, and can state it with precision." (Posten v. Rassette (1855) 5 Cal. 467, 469; see also Barcroft v. Livacich (1939) 35 Cal.App.2d 710, 720-721, 96 P.2d 951; Bituminous Cas. Corp. v. Vacuum Tanks, Inc. (5th Cir.1992) 975 F.2d 1130, 1133, fn. 3 [these rules exist to prevent fraud].)[5]

D. Interpretation of a Lost Insurance Policy

To enforce the rights of the parties to an insurance contract, the court must necessarily interpret the language used in the policy. (Montrose Chemical *179 Corp. v. Admiral Ins. Co. (1995) 10 Cal.4th 645, 677, 42 Cal.Rptr.2d 324, 913 P.2d 878 [to interpret an insurance policy, the court must consider "the language of the polic[y] of insurance to which the parties agreed, including the standardized definitions that were incorporated into" the policy], italics omitted.) As is true of contracts generally, the language of a lost insurance policy may be proved by secondary evidence, including oral testimony by witnesses "who were familiar with the policy's standard provisions, or copies of other policies sold at the same time which utilized similar provisions." (Rogers v. Prudential Ins. Co. (1990) 218 Cal.App.3d 1132, 1137, 267 Cal.Rptr. 499, italics added; see also Royal Globe Ins. v. Whitaker, supra, 181 Cal.App.3d at p. 537, 226 Cal. Rptr. 435.) In either event, however, the proof of the lost policy's terms and conditions must be sufficient to permit the trial court to determine the legal effect of the parties' agreement. (Rogers v. Prudential Ins. Co., supra, 218 Cal.App.3d at p. 1137, 267 Cal.Rptr. 499; U.S. Fidelity and Guar. Co. v. Thomas Solvent Co. (W.D.Mich.1988) 683 F.Supp. 1139, 1171; Harrow Products, Inc. v. Liberty Mut. Ins. Co. (6th Cir.1995) 64 F.3d 1015, 1021 [evidence was insufficient to prove the terms of a lost policy where witness was unable to testify about the "various rights and responsibilities of the parties," leaving the matter of coverage to "sheer speculation"]; Bituminous Cas. Corp. v. Vacuum Tanks, Inc., supra, 975 F.2d at pp. 1132-1133; City of Tacoma v. Great American Ins. Companies (W.D.Wash.1995) 897 F.Supp. 486, 487 [the burden is on the insured to show that a loss falls within the terms of a policy by reference to the "coverage language," which "specifies a number of factors that must be present for coverage to exist"].)
These rules are founded on the notion that a contract should be read to "give effect to the `mutual intention' of the parties. `Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation.... Such intent is to be inferred, if possible, solely from the written provisions of the contract .... The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" ..., controls judicial interpretation....' ... A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.... But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract...." (Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619, italics added.) Of course, there can be no ambiguity where, as here, there is no evidence of the language used in the policy and, therefore, no way to determine whether that language was clear or ambiguous. It follows that Dart's "reasonable expectations" of coverage are legally irrelevant. (Travelers Ins. Co. v. Lesher (1986) 187 Cal.App.3d 169, 186, 231 Cal.Rptr. 791 [unless there is an ambiguity in the policy, the insured's reasonable expectations of coverage are "inapplicable"].)

E. Dart Failed to Prove the Material Terms and Conditions of the Lost Policy

Pyne (who never read the policy) testified that the lost policy provided "occurrence-based" *180 coverage, but there is nothing in the record to suggest what words were used to define that term (or any term), and there is no documentation to corroborate Pyne's conclusory assertion. The court nevertheless found that it was an "occurrence" policy, with coverage for "product liability claims for bodily injuries occurring during the policy period," and that the lost policy covered "those DES claims against Dart in which the operative event (i.e., the ingestion of, or exposure to DES) occurred at any time during the September 1, 1946September 1, 1951" policy period, without regard to the time at which the injury manifested itself and without regard to the time at which the injury was discovered. Pyne's testimony is wholly insufficient to prove the terms and conditions of the policy and, therefore, wholly insufficient to prove Commercial's duty to defend or indemnify Dart against the DES claims. It follows that there is no evidence to support the trial court's findings. (Rogers v. Prudential Ins. Co., supra, 218 Cal.App.3d at p. 1137, 267 Cal. Rptr. 499; see also Waller v. Truck Ins. Exch., Inc., supra, 11 Cal.4th at p. 16, 44 Cal.Rptr.2d 370, 900 P.2d 619 [the insured has the burden of showing there has been an occurrence within the terms of the policy ]; Bituminous Cas. Corp. v. Vacuum Tanks, Inc., supra, 975 F.2d at pp. 1132-1133 [judgment in favor of insured reversed for failure to prove terms and conditions of policy, the court holding that evidence of "policy numbers, dates of coverage, and coverage amounts of the CGL policies" was insufficient, and that the trial court could not "make coverage decisions absent proof of the actual policy terms"]; and see U.S. Fidelity and Guar. Co. v. Thomas Solvent Co., supra, 683 F.Supp. at p. 1172; Ranger County Mut. Ins. Co. v. Chrysler Credit Corp. (Tex.1973) 501 S.W.2d 295, 297-298.)[6]
Because CGL policies have changed dramatically over the years, there is no substitute for Dart's failure to prove the material terms of the missing policy. Although it appears from the record that Commercial did issue occurrence-based policies in 1946, most CGL policies issued at that time were accident-based, not occurrence-based, and the latter format was not generally adopted until 1966. (Montrose Chemical Corp. v. Admiral Ins. Co., supra, 10 Cal.4th at pp. 669, 671, 42 Cal.Rptr.2d 324, 913 P.2d 878 ["occurrence" includes an event that is continuous over time]; compare Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co. (1959) 51 Cal.2d 558, 563-564, 334 P.2d 881 ["accident" means a sudden, unexpected event].)[7] *181 Without any evidence of the language used in Dart's missing policy, judicial interpretations of common words and phrases actually used in other CGL policies (e.g., "accident," "occurrence," "bodily injury") are irrelevant, and it is immaterial that the trial court also found coverage "[w]hether the ... Policy had `accident' or occurrence' coverage...." (Harrow Products, Inc. v. Liberty Mut. Ins. Co., supra, 64 F.3d at p. 1021 [the insured's inability to define the terms of coverage afforded by a lost policy is fatal to the insured's claims against its insurer].) Under both types of policies, it is the language used by the parties to express their contractual intent that determines whether there is a duty to defend and whether there is coverage, and the everyday meanings of various words and phrases become relevant only after an insured establishes that the particular policy does not provide an applicable definition. (Kremers-Urban Co. v. American Employers Ins. Co., supra, 351 N.W.2d at pp. 164, 166-167 [applying rules of construction identical to California's and construing successive policies to provide different coverage because different words were used in the policies].)[8] We have scoured the texts, raked through the cases, and ransacked every available source in search of a single case in which any court has either attempted to interpret an insurance policy or imposed a defense or indemnification duty on an insurer without reference to the language of the specific policy. We have found no such case.
Although we believe that a policy's language is critical whenever an insured demands a defense or indemnity under a CGL policy, we hold in this case that reference to the language of the policy is indispensable where the claimants allege that (20 years, more or less, after the fact) they have developed, or are at risk of developing, cancerous or precancerous lesions as a result of their in utero exposure to DES ingested by their mothers.[9] In short, Dart's failure to present admissible secondary evidence of the material terms and conditions of the lost policyfor example, by way of a copy of the lost policy, or testimony by someone who had read it and remembered its language, or by expert testimony establishing the practice in the *182 industry, or otherwisemeans Dart failed to meet its burden of producing evidence. By Dart's stipulation to retry this case on the record established at the first trial, Dart has conceded its inability to do more than it has already done. It follows that nothing would be gained by a remand for yet another trial, and that it is time to put an end to this litigation.

DISPOSITION
The judgment is reversed and the cause is remanded to the trial court with directions to enter a judgment in favor of Commercial Union. Commercial Union is entitled to its costs of appeal.
ORTEGA, Acting P.J., and MASTERSON, J., concur.
NOTES
[1] In 1986, Dart settled with its two primary carriers, Liberty Mutual Insurance Company and Continental Insurance Company. To allocate losses among the policies subject to the settlement, Liberty, Continental and Dart agreed on two "triggers of coverage" to identify the act or condition that would place a policy on the risk for a particular DES claim: (1) exposure in utero to DES (which the parties agreed would be the date of birth) or (2) manifestation of DES-related injuries. The settling parties also agreed that a policy in effect at either time (exposure or manifestation) would cover 50 percent of Dart's costs for the triggered DES claim. Commercial Union refused to participate in the settlement, and it is not bound by the stipulated triggers. (See E.R. Squibb & Sons, Inc. v. Accident And Cas. Ins. Co. (S.D.N.Y.1994) 860 F.Supp. 124, 126 [any limitation on triggers of coverage agreed upon by one insurer and the insured for settlement purposes has no effect on whether another insurer is liable].)
[2] Although Pyne's testimony includes an explanation of his personal understanding of an "occurrence policy," there is nothing in Pyne's testimony or anywhere in the record to show how the missing policy defined "occurrence" (or, for that matter, how it defined any of the terms used by Pyne). There is no evidence of any kind to show how Commercial (or any insurance company) defined "occurrence" during the 1940's or 1950's (or at any time). Pyne was candid about his memory. When asked whether the products coverage he described was in an endorsement to the policy, he responded: "Can you remember something 40 years ago? I doubt it." When asked whether he had "any recollection" about that point, Pyne answered: "Of course I don't. How the hell I wouldI would know? Excuse my French. How would I remember that? Good grief."
[3] Although Commercial makes this point in its opening brief on appeal. Dart simply ignores it and continues to cite to the excluded specimen policy as evidence supporting the trial court's findings and judgment. As a result, much of Dart's brief is irrelevant. When we inquired about this point at oral argument, Dart's lawyer said there was testimony by Pyne and Fortuna about the contents of the "specimen policy," and counsel claimed their testimony was admissible under the terms of the parties' stipulation. Counsel is mistaken. There is nothing in Pyne's or Fortuna's testimony about the language used in the specimen or in any policy, only about Pyne's abstract "understanding" of some generic insurance terms.
[4] Although the trial court found that a duty to defend was owed and that Commercial "refused to defend" Dart against the DES claims, the trial court did not find there was a breach of duty. (See Isaacson v. California Ins. Guarantee Assn., supra, 44 Cal.3d at p. 791, 244 Cal.Rptr. 655, 750 P.2d 297 [a refusal to defend is not a breach unless the refusal is "wrongful"].)
[5] In civil cases generally, the burden of proof (as opposed to the burden of producing evidence) is by a preponderance of the evidence. (Evid.Code, §§ 110, 115.) The language used in some of the older California cases (e.g., Caine v. Briscoe, supra, 78 Cal.App. at p. 669, 248 P. 774) and authority from other jurisdictions (e.g., Boyce Thompson Institute v. Insurance Co. of N.A. (S.D.N.Y.1990) 751 F.Supp. 1137, 1140 [clear and convincing evidence]; Zuckermandel v. Zuckermandel (N.J.1944) 135 N.J. Eq. 598, 39 A.2d 497; Oberkramer v. Brown (Mo.App.1982) 635 S.W.2d 63, 66 ["clear, cogent and convincing" evidence]; Stewart v. Wiley (Ariz. 1970) 106 Ariz. 213, 474 P.2d 804, 805 ["clear and convincing evidence"]; Castellano v. Bitkower (1984) 216 Neb. 806, 346 N.W.2d 249, 252 ["`clear, satisfactory, and convincing evidence'"]; but see Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. (N.D.Ohio 1998) 10 F.Supp.2d 856, 868 [preponderance of the evidence]; Americhem Corp. v. St. Paul Fire and Marine Ins. Co. (W.D.Mich. 1995) 942 F.Supp. 1143, 1144 [preponderance of the evidence]) suggests that proof of the terms and conditions of a lost document ought to be by clear and convincing evidence. Here, however, there is no need to go beyond the general rulebecause Dart has failed to establish the terms and conditions of the lost policy by even a preponderance of the evidence. For a detailed list of potential secondary evidence sources and suggestions about the manner in which a lost policy's terms and conditions may be proved, see California Practice Guide: Insurance Litigation, supra, paragraph 15:995, pages 15-173 to 15-174. (See also Boyce Thompson Institute v. Insurance Co. of N.A., supra, 751 F.Supp. at p. 1141 [finding several items of evidence insufficient to prove the existence or contents of a lost policy]; Servants of Paraclete, Inc. v. Great American Ins. (D.N.M.1994) 857 F.Supp. 822, 828-829 [finding letter from insurer acknowledging issuance of policy, testimony of insurer's business analyst about the type of policy issued to the plaintiff, testimony by an underwriter about the usual form of liability policies used at the time the lost policy was issued, written evidence of the exact premium paid, and at least two of the insurer's specimen policies, considered together, sufficient to defeat the insurer's motion for summary judgment].)
[6] Fortuna's testimony that Commercial issued both "accident" and "occurrence" policies in the 1940's shows only the possibility that this specially tailored manuscript policy could have been either, not that it was one or the other. The evidence that Commercial defended Dart with regard to two unrelated products liability claims (referred to by the parties as "Hinkle" and "Boone") proves nothing. There is no evidence about whether there was actually coverage for either "Hinkle" or "Boone" and it is pure speculation to assert, as does Dart, that Commercial's payment in itself somehow proves one or more terms of the missing policy. It is as likely as not that "Hinkle" (a mislabeling claim) and "Boone" (an exploding bottle claim) were defended or paid as an accommodation to Dart. In any event, the fact that Dart's lost policy might have been an occurrence policy does not prove that the language used in the lost policy would have provided coverage for the DES claims.
[7] The term "occurrence" originally came into use in insurance policies because a restrictive construction of the term "accident" proved unsatisfactory to insureds, the public, and the courts. The purpose of using "occurrence" rather than "accident" was to expand coverage, and to eliminate the doubt about whether, and to what extent, a CGL policy was intended to cover liability for injuries that resulted from gradual processes, rather than sudden events. (7A Appleman, Insurance Law and Practice (1979) § 4492 et seq., as quoted in Kremers-Urban Co. v. American Employers Ins. Co. (1984) 119 Wis.2d 722, 351 N.W.2d 156, 166; see also American Home Prod. v. Liberty Mut. Ins. Co. (S.D.N.Y.1983) 565 F.Supp. 1485, 1501, affd. as modified, American Home Products Corp. v. Liberty Mut. Ins. (2d Cir.1984) 748 F.2d 760.)
[8] In Kremers-Urban Co. v. American Employers Ins. Co., supra, 119 Wis.2d 722, 351 N.W.2d 156, a DES coverage case, the Wisconsin Supreme Court construed successive CGL policies issued by Commercial Union beginning in 1954. The court refused to consider whether there was coverage under any earlier policies because they "were not produced and [were] not part of the record.". (Id. at p. 158, fn. 1.) The policies that were before the court were occurrence-based, which the Wisconsin court found "expanded coverage to include more than was intended by `accident.' " (Id. at p. 167.) Based on that finding, Kremers-Urban held that it was not necessary to choose between the exposure theory of coverage or the manifestation theory of coverage "because `occurrence' contemplates both." (Ibid.) Since that holding is based upon the Wisconsin court's threshold finding that "occurrence" policies expand coverage beyond that afforded by "accident" policies, Kremers-Urban does not support the trial court's finding that the rule is the same with regard to accident-based policies.
[9] We do not know what was actually alleged in the DES claims that are the subject of Dart's dispute with Commercial, or whether (as the trial court found) the mothers of DES daughters separately asserted claims of their own. The only evidence of the underlying claims is a summary of the DES cases prepared and presented by one of Dart's lawyers, Wilber F. Pell III. The evidence does not include any of the complaints filed in the underlying DES cases. (See Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal.4th 1076, 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792.) Pell generally (but not specifically) described the claimants as the sons and daughters of mothers who had ingested DES, and the mothers themselves, then went on to generally describe Dart's settlement with its other carriers and to explain how the settling parties had allocated the risk during settlement negotiations. (See American Home Prod. v. Liberty Mut. Ins. Co., supra, 565 F.Supp. at pp. 1493, 1497 [discussing the possible triggers in a CGL coverage case based on DES claims and illustrating the importance of the policy's language in evaluating the insured's evidence offered to establish coverage under an occurrence-based policy].)